UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

J. M. G.,

                              Plaintiff,

        -against-                                    6:19-CV-1363 (LEK)

ANDREW M. SAUL, Commissioner,
Social Security Administration,

                              Defendant.

_____

## MEMORANDUM-DECISION AND ORDER

## I.    INTRODUCTION

        This Social Security appeal is before the Court pursuant to Plaintiff's complaint filed on

November 5, 2019. See Dkt. No. 1 ("Complaint"). Plaintiff seeks review of the determination

made by the Commissioner of Social Security that Plaintiff is not disabled and is therefore

ineligible for Supplemental Security Income and Social Security Disability Insurance. See id. at

1; see also Dkt. No. 8 ("Plaintiff's Brief") at 2; Dkt. No. 7 ("Record"). The Commissioner of the

Social Security Administration ("Commissioner") has responded. See Dkt. No. 9 ("Defendant's

Brief"). For the reasons that follow, the Commissioner's determination of no disability is

remanded for further proceedings consistent with this Memorandum-Decision and Order.

## II.   BACKGROUND

### A.  Plaintiff's Disability Allegations

        Plaintiff is a 38-year-old woman and was 35 years old at the time of her hearing in front

of the administrative law judge ("ALJ") on August 13, 2018. R. at 24, 30. Between 2003 and

2010, she worked for several different employers, primarily as a Licensed Practical Nurse

("LPN"). R. at 183. In 2010, Plaintiff became pregnant and left her job as a nurse. R. at 162. She

was not engaged in substantial gainful employment from that time until her date last insured[1] of September 30, 2013, nor has she engaged in substantial gainful employment since her date last insured. R. at 17.

Plaintiff alleges that she is disabled as a result of: 1) long thoracic nerve injury, 2) serratous anterior palsy, 3) post split pectoral muscle transfer, 4) a torn rotator cuff, 5) a possible torn labral, 6) arthritis in right shoulder with encroachment, 7) depression, and 8) anxiety. R. at 161. Of particular relevance to this appeal are Plaintiff's injuries to her right shoulder and her back.

### 1. Shoulder Injury

Plaintiff first suffered injuries relevant to this case in 2003 when she "fell off stairs," injuring her right shoulder. R. at 220. In 2004 or 2005 Plaintiff had surgery on her right shoulder. R. at 209. In early 2010, Plaintiff became pregnant. R. at 162. She had previously taken pain medication including Hydrocodone-acetaminophen for her shoulder pain, see R. at 222, but ceased taking pain medication due to her pregnancy, R. at 162. Plaintiff stopped working as a nurse on February 5, 2010. Id. She alleges that she first became disabled on March 15, 2010 and that her shoulder injury has since worsened. R. at 162.

In a March 29, 2012 office visit with Carrie Stemmer, FNP, Plaintiff complained of right shoulder pain which began after she placed her son in a crib. R. at 240. A surgeon recommended fusing her shoulder to her chest, but Plaintiff was ultimately prescribed Tramadol to control the

---

[1] "The date last insured ('DLI') is a technical term used by the Commissioner to mark the last day on which a claimant is eligible for [Disability Insurance Benefits] and is calculated using the claimant's recent work history—broadly speaking, taxes paid into the Social Security system accrue as 'work credits' that provide quarters of insurance coverage under the program." Kathy R. v. Comm'r of Soc. Sec., No. 19-CV-385, 2020 WL 1862967, at *4 n.4 (N.D.N.Y. Apr. 14, 2020). A parent who stays home to provide childcare does not earn such credits.

pain. R. at 243. At a subsequent office visit with Stemmer on July 14, 2012, Plaintiff reported

that the Tramadol was helpful, but requested additional medication for "break through" pain and

was prescribed hydrocodone pills. R. at 245. At another appointment with Stemmer on

September 7, 2012, Plaintiff reported "chronic shoulder aching," but "good results" with Ultram

and Hydrocodone. R. at 259.

All other available medical records that relate to Plaintiff's shoulder injury were created

after her date last insured of September 30, 2013. On July 21, 2014, Plaintiff visited Stemmer. R.

at 308. While the visit focused on Plaintiff's depression and anxiety, Plaintiff also reported

increased shoulder pain. Id. By February 6, 2015, Plaintiff was reporting that neither

Hydrocodone nor Tramadol were working well, resulting in a "dull constant ache to the right

shoulder, [and] also a pulling nerve type pain." R. at 319–20. As a result, Plaintiff's prescription

was modified to remove Ultram and add OxyContin. R. at 324. An X-ray on April 13, 2016

resulted in the impression of a "normal right shoulder," R. at 423, however, an MRI conducted

on May 15, 2016 found degenerative changes, bursal sided partial tear, and a possible short

segment SLAP tear, R. at 211. The MRI was also described as showing "partial-thickness rotator

cuff tear, possible SLAP tear, acromial clavicle joint arthritis with impingement, [and] pectoralis

major muscle transfer procedure." R. at 444. On August 20, 2016, Plaintiff received a shoulder

injection of lidocaine, bupivacaine and depo-Medrol, R. at 434, but this failed to significantly

reduce her pain, R. at 444. On November 16, 2016, Plaintiff was given the option of

"arthroscopy, capsular shift, and possible labral/rotator cuff repair." Id. Plaintiff opted to proceed

with the surgery, which occurred on December 5, 2016. R. at 705. However, shortly thereafter on

December 25, 2016, Plaintiff experienced a "tearing feeling" near her scapula and increased

shoulder pain. R. at 456. A month later, on January 25, 2017, Plaintiff was a passenger in a

motor vehicle accident, R. at 705, which exacerbated her shoulder injury. R. at 463–464. As of June 8, 2018, Plaintiff was still experiencing "lots of breakthrough" pain and unable to reduce her pain medication dosage. R. at 477.

      *2. Back Injury*

Plaintiff's back injury began in November 2012 while she was giving her son a piggyback ride. R. at 912. Plaintiff first reported this injury in an office visit with Larry Martinson, PA on November 19, 2012. Id. Plaintiff reported significant back pain, going down to her ankle, which was diagnosed as likely resulting from a slippage at the SI joint. Id. On January 23, 2013, during another office visit with Mr. Martinson, Plaintiff reported continuing severe back pain, going down into her groin and upper legs. R. at 906. Plaintiff was prescribed cyclobenzaprine, her dose of hydrocodone was increased, and she was referred to a physical therapist for further evaluation and treatment. Id.

On August 20, 2015, nearly two years after Plaintiff's last date insured, in an office visit with Carrie Stemmer, FNP, Plaintiff reported sharp pain, then pain and tenderness in her lower back and both legs, which began when she felt a "pop" as she boosted her son up into a chair. R. at 853. She reported that her back pain in the past was the result of a "facet joint" and that it had resolved on its own. Id.

On January 25, 2017, Plaintiff was a passenger in a motor vehicle accident. R. at 705. A subsequent MRI of her lumbar spine on April 21, 2017 showed "a large central extrusion causing moderate central stenosis." Id. Three days later, in reviewing this MRI, Nicholas Qandah, DO described Plaintiff's condition as "a severe spinal stenosis at L4-5 and large disc herniation" and recommended surgery. R. at 697. On May 2, 2017, Plaintiff underwent the surgery. R. at 564. At

a follow up on May 15, 2017, Plaintiff indicated that her lower back was "feeling much better" and she was "happy with her outcome." R. at 965.

### B. The ALJ Decision

#### 1. *ALJ's Analysis of Plaintiff's Testimony*

The ALJ issued her decision on October 18, 2018. R. at 26. In it, she found only Plaintiff's "lumbar degenerative change" and "recurrent shoulder dislocation" to be severe impairments. R. at 17. Addressing Plaintiff's testimony, the ALJ found that "claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." R. at 21. She further found that "[t]he medical evidence of record is inconsistent with and does not support the claimant's allegations of disabling functional limitations due to lumbar degenerative change and recurrent shoulder dislocation." Id.

With regard to Plaintiff's lumbar degenerative change, the ALJ noted that Plaintiff "underwent a discectomy in 2017 after one treating medical service provider cited her as having 'severe' spinal stenosis" and that some straight leg raise tests were positive while others were negative. Id. However, she found "the claimant's allegations regarding such findings and her function [to be] inconsistent with the record." Id. This finding was based on both medical evidence and other evidence. The medical evidence included "[p]hysical examinations and imaging studies show[ing] no deformity or scoliosis of the thoracic or lumbar spine," an imagining study following the "severe" diagnosis showing the spinal stenosis to be "moderate

central stenosis with mild disc bulge,"[2] the lack of evidence that Plaintiff had required or been prescribed an assistive devise to help with ambulation, and several notes by "treating medical service providers throughout the adjudicatory period" that Plaintiff was not in "acute distress." Id. The other evidence cited by the ALJ included the fact that "[d]uring the adjudicatory period, [Plaintiff] was able to engage in physical activities that involved postural movement such as bending and squatting, as well as pushing and pulling, including putting her child in the child's crib, driving a car and grocery shopping" as well as "replac[ing] the brakes on her brother's car." R. at 21–22.

Regarding Plaintiff's recurrent shoulder dislocation, the ALJ noted that while Plaintiff "reported her shoulder comes out of joint one to three times each month, caused by reaching of any kind and any weight on her right shoulder" the record indicated that she "was generally capable of engaging in daily activities that included driving, shopping in grocery stores, carrying groceries, use (sic) a telephone, changing the brakes on her brother's car, placing her child in the child's crib, [and] attending physical therapy." R. at 22. The ALJ also found medical evidence inconsistent with Plaintiff's testimony. This included: an MRI resulting in "an impression of 'normal right shoulder;'" a finding of "5/5 strength in her biceps, triceps, abduction and adduction, normal range of motion" as well as normal stability "with regard to anterior, posterior and inferior stresses;" a finding that her "rotator cuff was normal strength and there was no sign of muscle wasting;" and the fact that Plaintiff did not always use a brace. Id.

---

[2] The ALJ appears to have reversed the timeline. The imaging study was initially described as finding "a large central extrusion causing moderate central stenosis." R. at 702. Three days later, in reviewing the same MRI, Nicholas Qandah, DO described Plaintiff's condition as "a severe spinal stenosis at L4-5 and large disc herniation" and recommended surgery. R. at 697.

Finally, the ALJ remarked that the "lack of anything more than relatively conservative treatment" and "indications of effective treatment and generally normal examination findings . . . suggest that claimant's conditions are not as limiting as alleged." Id.

2. *ALJ's Analysis of Medical and Opinion Evidence*

Aside from two temporary opinions regarding discharge instructions, the only medical opinion considered was that made by Carrie Stemmer, FNP ("Stemmer") on July 5, 2018. As the ALJ noted, the opinion also appears to be signed by "Dr. Parker." R. at 23. As summarized by the ALJ,

> [t]he opinion indicated that claimant's symptoms would interfere with her workday 21%-30% of an 8-hour workday. In addition, she could walk 1 block, she can sit up to 1 hour at a time, can stand and walk up to 30 minutes at a time, can sit up for 2 hours total and stand and walk up to 2 hours total in an 8-hour workday, sit, stand and walk a total of 2 hours, and must walk and rest 10-15 minutes every 60 minutes. In addition, she must prop up her right arm, can lift less than 10 pounds rarely and never more than 10 pounds, can occasionally look down or up, turn her head right or left, or hold her head in static position, twist, stoop, court and squat, climb stairs, and can never climb ladders. The opinion further indicates that the claimant can finger 25% of an 8-hour workday with her right upper extremity, and can never handle or reach with her right upper extremity, would miss 4 or more days each month, and is not capable of sustaining an 8 hour workday.

Id. The ALJ gave the opinion "some weight," but found both Plaintiff's daily activities and the medical record to conflict with Stemmer's opinion. Id. In particular, the ALJ found the following activities to "exceed the limitations stated above:"

> driving a car, shopping in grocery stores, carrying a bag of groceries, changing the brakes on her brother's car, placing her child in the child's crib, attending physical therapy during the adjudicatory period, placing laundry in the washing machine and wiping down counters, reading, preparing meals and using a telephone.

Id. As for the inconsistent medical evidence, the ALJ specifically highlighted findings from an appointment with Kevin Setter, MD on April 12, 2016. See R. at 23, 212–13, 426. At that office visit, the ALJ writes, Plaintiff "was noted to have 5/5 strength in her biceps, triceps, abduction and adduction, normal range of motion and 'stability of the shoulder is normal with regard to anterior, posterior and inferior stresses.'" R. at 23. (quoting medical records, R. at 209). The ALJ further noted that Plaintiff's "rotator cuff was normal strength and there was no sign of muscle wasting" and that a "Magnetic Resonance Imaging (MRI)[3] study performed at the same time was unremarkable and resulted in an impression of 'normal right shoulder.'" Id.

### 3. The ALJ's Disability Analysis

The ALJ ultimately found Plaintiff was not disabled and denied her application for disability insurance benefits and supplemental security income. R. at 25. In making this determination, the ALJ analyzed Plaintiff's testimony, the underlying medical record, and the opinion of Carrie Stemmer, FNP as described above. See R. at 17–25.

The ALJ found that Plaintiff last met the Social Security Act's insured status requirements on September 30, 2013 and had not engaged in gainful activity since February 5, 2010, the alleged onset date. R. at 17. The ALJ found that Plaintiff had two severe impairments: lumbar degenerative change and recurrent shoulder dislocation. Id. The ALJ concluded that Plaintiff's other alleged impairments, including obesity, cholelithiasis and cholecystitis, depression and anxiety, long thoracic nerve injury, serratus anterior palsy, post-split pectoral muscle transfer, shoulder pain, arm pain, hyperglycemia, fatigue, history of gestational diabetes mellitus and sciatica were non-severe or not medically determinable. R. at 17–19. The ALJ

---

[3] The record indicates that this finding was the result of an X-ray and not an MRI study. R. at 423. An MRI conducted shortly after showed "degenerative changes, bursal sided partial tear, and a possible short segment SLAP tear." R. at 211.

found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1. R. at 19.

Next the ALJ found that, through the date last insured, Plaintiff had the residual functional capacity ("RFC") to:

> perform light work as defined in 20 CFR 404.1567(b) except she can lift and carry 20 pounds occasionally, can lift 10 pounds frequently with her left upper extremity, can lift and carry 10 pounds frequently and occasionally with her right upper extremity (the dominant hand), can stand, walk for 6 hours and can sit for 6 hours, she can frequently stoop, crouch, kneel and crawl, she can occasionally climb stairs and ramps but cannot climb ladders, ropes or scaffolds, she can occasionally reach overhead with her right upper extremity, can frequently reach in all directions with her right upper extremity and can frequently handle and finger with her right upper extremity.

R. at 20. In light of this RFC, the ALJ found Plaintiff "unable to perform any past relevant work." R. at 23. However, the ALJ found that there were jobs in significant numbers in the national economy that claimant could perform given her RFC, age, education, and work experience and thus Plaintiff was not disabled. R. at 24.

## C. Procedural History

Plaintiff filed her initial application for supplemental security income and social security disability insurance on July 1, 2016. R. at 148. The social security administration denied her claim on August 24, 2016. R. at 82. Thereafter, Plaintiff requested a hearing before an ALJ, which was held August 13, 2018. R. at 30.

On October 10, 2018 the ALJ issued the above-described opinion, denying Plaintiff's claim for benefits. R. at 15–26. On November 26, 2018, Plaintiff requested review by the Appeals Council, which was denied on October 9, 2019. R. at 5.

On November 05, 2019, Plaintiff initiated this appeal. <u>See</u> Compl. In her brief, Plaintiff

argues that the ALJ erred in her decision that Plaintiff was not disabled. Pl.'s Br. at 1.

## III.    LEGAL STANDARD

### A.  Standard of Review

When a district court reviews an ALJ's decision denying a claim for social security

benefits, it must determine whether the ALJ applied the correct legal standards and whether the

decision is supported by substantial evidence in the record. 42 U.S.C. § 405(g); <u>see also</u> <u>Rosa v.</u>

<u>Callahan</u>, 168 F.3d 72, 77 (2d Cir. 1999). Substantial evidence is "more than a mere scintilla,"

and must reasonably support the decision maker's conclusion. <u>Halloran v. Barnhart</u>, 362 F.3d 28,

31 (2d Cir. 2004) (quoting <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971)). Substantial

evidence has alternatively been described as "such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion." <u>Biestek v. Berryhill</u>, 139 S. Ct. 1148, 1154 (2019).

This "very deferential standard of review," <u>Brault v. Soc. Sec. Admin., Comm'r</u>, 683 F.3d 443,

448 (2d Cir. 2012), requires a court to defer to an ALJ's decision if supported by substantial

evidence, "even if [the court] might justifiably have reached a different result upon a de novo

review." <u>Sixberry v. Colvin</u>, No. 12-CV-1231, 2013 WL 5310209, at *3 (N.D.N.Y. Sept. 20,

2013) (quoting <u>Valente v. Sec'y of Health & Human Servs.</u>, 733 F.2d 1037, 1041 (2d Cir.

1984)).

### B.  Standard for Award of Benefits

A "disability" sufficient to merit an award of benefits under the Social Security Act is

defined as "the inability to do any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or which

has lasted or can be expected to last for a continuous period of not less than 12 months." 20

C.F.R. § 404.1505(a). However, an individual seeking disability benefits "need not be completely helpless or unable to function." <u>De Leon v. Sec'y of Health and Human Servs.</u>, 734 F.2d 930, 935 (2d Cir. 1984).

An ALJ undergoes a five-step evaluation process to determine whether a claimant is disabled and eligible for disability benefits. 20 C.F.R. § 404.1520(a)(1). If the ALJ determines at any step that the claimant is disabled or not disabled, the evaluation ends. 20 C.F.R. § 404.1520(a)(4). Otherwise, the ALJ will proceed to the next step. <u>Id.</u>

At step one, the ALJ must determine whether the claimant is engaged in "substantial gainful work activity." 20 C.F.R. § 404.1520(a)(4)(i). If so, the claimant is not disabled. <u>Id.</u> At step two, the ALJ must determine whether the claimant has a medically determinable impairment, or combination of impairments, that is "severe," i.e., that "significantly limits" the claimant's "physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(c). If the claimant does not have such an impairment, the claimant is not disabled. <u>Id.</u> At step three, the ALJ asks whether the claimant's medically determinable impairment(s) are as severe as an impairment listed in Appendix 1 of Subpart P of § 404. 20 C.F.R. § 404.1520(a)(4)(iii); 20 C.F.R., Pt. 404, Subpt. P, App. 1. If so, the claimant is disabled. <u>Id.</u> At step four, the ALJ determines claimant's RFC and determines whether claimant can perform work they performed in the past, if they can, they are not disabled. 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant cannot perform past relevant work, or if the claimant does not have any relevant past work, the ALJ decides at step five whether, given the claimant's RFC, age, education, and work experience, they are capable of adjusting and performing "other work" that exists in significant numbers in the national economy. 20 C.F.R. § 404.1520(a)(4)(v). If the claimant "cannot make an adjustment to other work," then the claimant is disabled. <u>Id.</u>

In the first four steps, the claimant bears the burden of proof. At step five, the burden

shifts to the Commissioner. <u>Kohler v. Astrue</u>, 546 F.3d 260, 265 (2d Cir. 2008) (quoting <u>Perez v.

Chater</u>, 77 F.3d 41, 46 (2d Cir. 1996)).

## IV.   DISCUSSION

Plaintiff's sole basis for challenging the ALJ's determination is that the ALJ erred by

formulating an RFC largely inconsistent with the Stemmer opinion—here the only formal

medical assessment of Plaintiff's condition in the record. <u>See</u> Pl.'s Br. at 1; R. at 23. Plaintiff

contends that the ALJ substituted her own opinion for Stemmer's and formulated the residual

functional capacity based on bare medical findings. Pl's Br. at 5.

Regardless of its consistency with the record, both parties agree that a nurse practitioner's

opinion is not entitled to controlling weight. <u>Id.</u> at 6; Def.'s Br. at 13; <u>see also</u> <u>Kohler v. Astrue</u>

546 F. 3d 260, 268 (2nd Cir. 2008). In addition, Stemmer "only completed a fill-in-the blank

medical source statement, which is marginally useful for purposes of creating a meaningful and

reviewable factual record." <u>House v. Astrue</u>, No. 11-CV-915, 2013 WL 422058, at *3 (N.D.N.Y.

Feb. 1, 2013). Furthermore, Stemmer's opinion is dated July 6, 2018, R. at 980, nearly five years

after Plaintiff's last insured date of September 30, 2013,[4] R. at 17, the date as of which the ALJ

---

[4] While Defendant contends that the opinion is intended to characterize Plaintiff's symptoms and limitations dating back to 2002, the Court finds it more plausible that the opinion reflected Plaintiff's condition as of July 2018. Stemmer answered the question "[w]hat was the earliest date that the symptoms and limitations applied?" by providing the year 2002. Putting aside the fact that Plaintiff was originally injured in 2003, the Court interprets this answer as intended to refer to the date of Plaintiff's original injury. If, as Defendant contends, Stemmer's intent was to represent that all of Plaintiff's current limitations have applied since her original injury, then Stemmer's opinion is blatantly inconsistent with Plaintiff's work history, which includes working as a nurse up until 2010. Assuming the Court's interpretation is correct, Stemmer's opinion about Plaintiff's condition in 2018 may shed little light on Plaintiff's condition as of 2013.

purports to have evaluated Plaintiff's RFC, R. at 20. All these factors may decrease the weight due to Stemmer's opinion. The question, however, is whether, to the extent that the ALJ deviated from Stemmer's opinion, the ALJ's conclusions are supported by substantial evidence. The Court finds that they are not, and remands for further consideration consistent with this opinion.

The Court reaches this conclusion for two reasons. First, in evaluating the reliability of Stemmer's opinion, the ALJ picks and chooses evidence to characterize Stemmer's opinion as inconsistent with the medical record. Second, while the ALJ is not obligated to seek a new medical opinion where the record is complete, neither is she permitted to construct an RFC from bare medical findings. Here, part of the ALJ's RFC, specifically her finding that Plaintiff can walk for 6 hours, can sit for 6 hours, and can frequently carry 10 pounds with her right upper extremity, cannot be derived from the cited record evidence without directly interpreting bare medical findings.

### A. The ALJ May Have Substituted Her Own Expertise or View of The Medical Proof for Stemmer's, and Did Not Sufficiently Explain Her Reasoning

An ALJ is "not permitted to substitute his own expertise or view of the medical proof . . . for any competent medical opinion." Greek v. Colvin, 802 F.3d 370, 375 (2d Cir. 2015). In addition, an ALJ is required to "ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." 20 C.F.R. § 404.1527(f)(2). Here, because the ALJ has failed to sufficiently explain her reasoning, it is not clear whether the ALJ has substituted her expertise for that of Stemmer.

In explaining her skepticism for Stemmer's opinion, the ALJ emphasizes findings from Plaintiff's appointment with Kevin Setter, MD on April 12, 2016. See R. at 23, 209–10, 423. At

that office visit, the ALJ writes, Plaintiff "was noted to have 5/5 strength in her biceps, triceps, abduction and adduction, normal range of motion and 'stability of the shoulder is normal with regard to anterior, posterior and inferior stresses.'" R. at 23 (quoting medical records, R. at 209). Plaintiff also obtained an X-ray (inaccurately characterized by the ALJ as an MRI), which resulted in the "impression of 'normal right shoulder.'" R. at 23, 423. Finally, at the same appointment, Plaintiff was scheduled for an MRI. R. at 420. When the MRI was conducted, about a month later, it "found degenerative changes, bursal sided partial tear, and a possible short segment SLAP tear." R. at 211. While the ALJ emphasized the doctor's exam notes and the X-ray results, she failed to even mention the MRI findings, which may have been more consistent with Stemmer's opinion. See R. at 23.

"[C]onflicts in the evidence are for the ALJ to resolve," Charlotte K. v. Comm'r of Soc. Sec., No. 17-CV-642, 2018 WL 4153925, at *14 (N.D.N.Y. Aug. 29, 2018), but "[i]t is not proper for the ALJ to simply pick and choose from the transcript only such evidence as supports his determination." Sutherland v. Barnhart, 322 F.Supp.2d 282, 289 (E.D.N.Y. 2004). Here, by mislabeling the April 12, 2016 X-ray as an MRI and completely neglecting to mention the apparently contradictory results of the actual MRI scheduled at that very appointment, the ALJ has rendered the Court unable to determine if her decision is supported by substantial evidence. The ALJ's choice to deviate from Stemmer's assessment of Plaintiff's limitations may have an effect on the outcome of the case in that it necessarily affected the ALJ's determination of Plaintiff's RFC and thereby the determination of whether Plaintiff was disabled. As such, the opinion must be remanded for clarification and appropriate consideration of the MRI results from May 15, 2016.

### B.  The ALJ May Have Based Her RFC on Her Own Interpretation of Bare Medical Findings and Did Not Sufficiently Explain Her Reasoning

ALJs have a duty to "develop the record," reflecting "the essentially non-adversarial nature of a benefits proceeding." Guillen v. Berryhill, 697 F. App'x 107, 108 (2d Cir. 2017). However, "[w]here there are no obvious gaps in the administrative record, and where the ALJ already possesses a complete medical history, the ALJ is under no obligation to seek additional information" Monroe v. Comm'r of Soc. Sec., 676 F. App'x 5, 9 (2d Cir. 2017) (quoting Pellam v. Astrue, 508 F. App'x 87, 90 (2d Cir. 2013)). While "the SSA regulations provide that the agency 'will request a medical source statement,'" Pellam v. Astrue, 508 F. App'x 87, 90 n.1 (2d Cir. 2013) (quoting 20 C.F.R. § 404.1513(b)(6)), there is no bright line rule requiring that RFC findings must be based on a medical opinion. See, e.g., Monroe, 676 F. App'x at 8 (2d Cir. 2017). ALJs may derive their RFC findings from medical records that indicate the patient's limitations as well as from other record evidence, for instance about a plaintiff's activities. See, e.g., id.; Dawn T. v. Saul, No. 19-CV-619, 2020 WL 1915259, at *10 (N.D.N.Y. Apr. 20, 2020). However, "an ALJ is not qualified to assess a claimant's RFC on the basis of bare medical findings." House, No. 11-CV-915, 2013 WL 422058, at *4.

Both parties cite to Monroe v. Comm'r of Soc. Sec., 676 F. App'x 5 (2d Cir. 2017), but disagree about its implications. In Monroe, the ALJ rejected a doctor's medical assessment but relied on both his "treatment notes dating back before the alleged onset date" which included not only descriptions of the plaintiff's symptoms, but "also provide[d] contemporaneous medical assessments of [plaintiff's] mood, energy, affect, and other characteristics relevant to her ability to perform sustained gainful activity." Id. at 8. That ALJ also considered the doctor's "well-documented notes relating to Monroe's social activities relevant to her functional capacity—such as snowmobile trips, horseback riding, and going on multiple cruise vacations." Id. Plaintiff argues that the ALJ here "did not formulate a logical bridge between how the assessments were

15

directly relevant to the ability to perform substantial gainful activity." Pl.'s Br. at 8. Defendant

responds that <u>Monroe</u> includes no requirement of a "logical bridge." Def.'s Br. at 17–18.

Defendant may be correct that in some cases the connection between evidence and conclusion

will be so clear as to require no logical bridge. However, in general, "[i]t is the ALJ's

responsibility to 'build an accurate and logical bridge from the evidence to [his] conclusion to

enable meaningful review." <u>Arch v. Comm'r of Soc. Sec.</u>, No. 20-CV-2842, 2021 WL 4200719,

at \*12 (S.D.N.Y. Aug. 3, 2021) (internal quotation marks omitted); <u>see also</u> <u>Mark H. v. Comm'r</u>

<u>of Soc. Sec.</u>, No. 18-CV-1347, 2020 WL 1434115, at \*3 (N.D.N.Y. Mar. 23, 2020) ("The RFC

assessment must also include a narrative discussion, describing how the evidence supports the

ALJ's conclusions, citing specific medical facts, and non-medical evidence.").

      Here, in her RFC, the ALJ found that Plaintiff "can lift and carry 10 pounds frequently

and occasionally with her right upper extremity (the dominant hand), can . . . walk for 6 hours

and can sit for 6 hours." R. at 20. However, the ALJ cites no record evidence, and the Court is

aware of none, directly supporting these findings. Instead, the ALJ cites only Plaintiff's activities

and the results of medical tests and exams. R. at 21–22. The Court addresses each in turn.

      The ALJ lists approximately ten of Plaintiff's documented activities in reaching her RFC

decision. As an initial matter, "[a] claimant need not be an invalid to be found disabled," <u>Kirby</u>

<u>v. Saul</u>, No. 20-CV-2270, 2021 WL 4197264, at \*3 (E.D.N.Y. Sept. 15, 2021), and a plaintiff

who "still has hobbies, …can still go outside, and …can still function and take care of herself"

may still be disabled as "[i]t is well-settled that '[s]uch activities do not by themselves contradict

allegations of disability, as people should not be penalized for enduring the [symptoms] of their

disability in order to care for themselves,'" <u>Davis v. Berryhill</u>, No. 17-CV-6168, 2018 WL

1980251, at \*8 (W.D.N.Y. Apr. 27, 2018). More to the point, the ALJ does not explain how any

of the listed activities support the ALJ's RFC with regard to Plaintiff's ability to frequently lift
and carry ten pounds with her right hand, walk for 6 hours, or sit for 6 hours. Each activity is
considered below:

- **Spending time with family and having people over to her home.** Plaintiff states "I
  keep in touch with my family through phone and short visits in my home." R. at 175.
  Short visits in the home provide no support for the ALJ's finding with regard to
  Plaintiff's ability to walk, sit or lift weight with her right hand. See Elbert v. Barnhart,
  335 F. Supp. 2d 892, 910 (E.D. Wis. 2004) ("one can be disabled and yet get together
  with family or friends from time to time.").

- **Driving a car.** Plaintiff states "I have difficulty driving, but I can drive short
  distances." R. at 174. As the ALJ notes, the ability to drive may suggest some ability
  to "engage in postural movements such as bending and squatting, as well as pushing
  and pulling." R. at 21. However, the ability to drive short distances indicates nothing
  about Plaintiff's ability to lift weight with her right hand or to sit or walk for extended
  periods.

- **Grocery Shopping.** Plaintiff states "I can make short trips to the store for light
  groceries …. My mother-in-law & husband do the majority of the shopping …. I shop
  once a week or every other week for light, easy to reach items. I can only do short
  shopping trips, approximately 30-45 min. Sometimes I need a short period of rest
  during." R. at 174. The ability to make short trips to the store for light items does not
  indicate an ability to walk or sit for extended periods. It also does not indicate
  anything about Plaintiff's ability to lift weight in her right hand, as she may lift the
  light groceries in her left hand. See Clifford v. Apfel, 227 F.3d 863, 872 (7th

Cir.2000) (rejecting ALJ's reliance on plaintiff's ability to go grocery shopping about three times a month and sometimes carry groceries from the car to the apartment).

- **Attending physical therapy.** Plaintiff has attended physical therapy at several different times since 2010. See, e.g., R. at 410, 473. Presumably, this was intended to improve Plaintiff's physical condition, however, the ALJ does not indicate how attending the physical therapy demonstrates any particular ability to walk or sit for extend periods or to lift weight.

- **Using a telephone.** Plaintiff states that her parents check on her via phone daily and that she keeps in touch with family via phone. R. at 175. The ability to use a phone has no bearing a Plaintiff's ability to sit, walk, or lift weight.

- **Watching television and reading.** Plaintiff states that she watches tv daily and reads weekly. Id. These activities indicate nothing about Plaintiff's ability to sit, walk, or lift weight.

- **Household chores.** Plaintiff states "I can do partial chores such as I can put laundry in the washer but I'm not able to switch it to the dryer or carry loads of laundry. I can wipe down surfaces. I'm very limited in what I can do because of pain & decreased range of motion." R. 173. Plaintiff's ability to complete "partial chores" does not indicate that Plaintiff has the ability to sit or walk for extended periods, nor the ability to lift ten pounds in her right hand.

- **Preparing meals.** Plaintiff states "I make frozen or single boxed meals for my son's breakfast & lunch. I make homemade meals for dinner with my mother-in-law's & husband's assistance…. I require assistance with making meals because I'm not able to lift, reach or open things and pain prevents me from cutting meat & vegetables or

standing without arm support …. My husband and mother-in-law do the majority of the preparation with me helping when I can." R. at 173. Plaintiff's ability to make frozen or single boxed meals and to play some role in preparing homemade meals suggests some ability to stand, but does not indicate an ability to walk for 6 hours, and indicates nothing about Plaintiff's ability to sit or lift weight in her right hand.

- **Placing her child in the child's crib.** Plaintiff placed her 18-month-old child in his crib. R. at 240. While the child likely weighed more than ten pounds, Plaintiff presumably used both hands to lift her child. Furthermore, this lifting seriously exacerbated Plaintiff's injury, causing "nerve pain" down her arm and the arm to feel "loose" and "stretched." R. at 240. Even if this incident demonstrates that Plaintiff has, on occasion, lifted more than ten pounds with her right hand, the ALJ does not explain how it illustrates that she can do so frequently. Indeed, the fact that lifting her child seriously exacerbated Plaintiff's injury may suggest that her ability to lift weight in her right hand is limited.

- **Changing the brakes on her brother's car**. Plaintiff "changed the brakes of her brothers car . . . and woke up with searing right breast pain, shoulder drooping, and significant reduction of right shoulder motion." R. at 419. As the ALJ notes, changing the brakes on a car certainly indicates a certain "ab[ility] to function." R. at 22. However, the ALJ fails to explain how this incident is relevant to Plaintiff's ability to sit or walk for extended periods or to lift weight in her right hand. Furthermore, as with lifting Plaintiff's child, even if this incident indicates that Plaintiff has lifted more than ten pounds with her right hand, the fact that the incident resulted in a

serious exacerbation of her injury provides cause for doubt that she can do so frequently.

Thus, none of the activities listed, without further explanation, support the ALJ's finding that Plaintiff "can lift and carry 10 pounds frequently and occasionally with her right upper extremity (the dominant hand), can . . . walk for 6 hours and can sit for 6 hours." R. at 20. Had Plaintiff engaged in "snowmobile trips [and] horseback riding" as did the Plaintiff in Monroe, no logical bridge would be required to reach the conclusion that Plaintiff can sit for extended periods of time. Here, however, the activities described do not provide direct support for the ALJ's conclusion, and a logical bridge is necessary.

This leaves the medical record. The ALJ cites the following medical test and exam results: a "[p]hysical examination and imaging studies showed no deformity or scoliosis of the thoracic or lumbar spine," R. at 21; "an imaging study of the claimant's spine [found] the spinal stenosis was reduced to moderate central stenosis with mild disc bulge," id.; "imaging studies showed degenerative changes in the claimant's spine and back," id.; "straight leg raise tests were positive, sometimes on the right and sometimes on the left with inconsistent indication of whether the tests were performed sitting, supine or both," id.; "at other times, straight leg raise tests were negative," id.; an X-ray (mislabeled as an MRI) resulted in "an impression of 'normal right shoulder,'" R. at 22 (citing doctor's notes, R. at 423); and an examination of Plaintiff's right shoulder showed "5/5 strength in her biceps, triceps, abduction and adduction, normal range of motion" as well as normal stability "with regard to anterior, posterior and inferior stresses" and a rotator cuff with "normal strength and . . . no sign of muscle wasting," id. All of these test results, with the possible exception of the final two, constitute bare medical facts from which the ALJ was not entitled to deduce RFC limitations. See House, No. 11-CV-915, 2013 WL 422058,

at *4. Finally, while doctors' notes about "5/5 strength," "normal strength," and a "normal right shoulder," could reasonably support the ALJ's finding that Plaintiff can "lift and carry 10 pounds frequently and occasionally with her right upper extremity," R. at 20, the ALJ's reliance on these findings is undermined, as described above, by her failure to account for a contemporaneous and contradictory MRI result. Furthermore, these findings indicate nothing about Plaintiff's ability to sit or walk for extended periods.

Given that the ALJ has not clearly indicated how either Plaintiff's activities or the medical record supports her conclusion that Plaintiff "can lift and carry 10 pounds frequently and occasionally with her right upper extremity (the dominant hand), can . . . walk for 6 hours and can sit for 6 hours," the Court is left to assume that she based these conclusions on her interpretation of the bare medical facts she cites. As such, the case must be remanded to the ALJ for clarification and, if necessary, further development of the record.[5]

## V.   CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that the Commissioner's determination of no disability is **VACATED**, and the matter is **REMANDED** for further proceedings consistent with this Memorandum-Decision and Order; and it is further

---

[5] The Court recognizes the challenges associated with obtaining a new medical opinion of Plaintiff's condition in 2013. As noted in Footnote 4, the Court finds it likely that Stemmer's 2018 opinion was intended to describe Plaintiff's condition as of 2018 and not as of 2013, possibly explaining any inconsistencies between Stemmer's opinion and other medical evidence in the record. The Court does not express an opinion as to whether the ALJ must request a new medical opinion. However, the ALJ may benefit from an opinion by Stemmer or another medical expert, which explicitly identifies plaintiff's limitations as of her last insured date of September 30, 2013.

21

**ORDERED**, that the Clerk of the Court serve a copy of this Memorandum-Decision and

Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

DATED:        September 30, 2021
              Albany, New York

Lawrence E. Kahn
Senior U.S. District Judge